UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| JANE DOE,<br><br>          *Plaintiff*,<br><br>  v.<br><br><br>PAULO CERQUEIRA AND MARA CERQUEIRA<br><br>          *Defendants*. | Civil Action No.: |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

The Plaintiff, Jane Doe, hereby sues the Defendants, as follows:

**INTRODUCTION**

1.     The Plaintiff is a 44-year-old woman whom the Defendants lured into a four-year predatory living situation under the pretense of performing part-time farm work for $100 per week.

2.     What began as a job tending 30 rabbits at the Defendants' farm, grew to 12-hour plus workdays involving all aspects of the farm including domestic and other services, such as cleaning and cooking, making beds, typical farm labor such as tending to the cows and carrying bales of hay, and even constructing an addition to the farmhouse.

3.     For nearly four years, the Plaintiff endured fear and threats of violence and sporadic violence to herself, her autistic daughter, and teenage son. On numerous occasions the Plaintiff was further compelled to engage in non-consensual sex with the Defendant.

**JURISDICTION AND VENUE**

4.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

5.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 as this action involves questions of federal law; and 18 U.S.C. § 1595 as this action involves an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1584, 1589, 1590, 1593A.

6.   This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

7.   Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

8.   The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

9.   Defendant Paulo Cerqueria is an individual who, at all relevant times, resided at 50 Towers Road, Greenbush, Maine (the "Farm"). He is the husband of Defendant Mara Cerqueira.

10.  Defendant Mara Cerqueira is an individual who, at all relevant times, resided at 50 Towers Road, Greenbush, Maine. She is the wife of Defendant Paulo Cerqueira.

11.  Plaintiff Jane Doe is a 44-year-old woman who resides in Maine. Her precise location remains undisclosed for her own protection.

**FACTS**

**A.  Background**

12.     The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein

13.     In 2016, the Plaintiff was the sole caregiver to her children, a teenaged daughter with autism and a teenaged son.

14.     In mid-2016, the Plaintiff lived with her children in a trailer she leased on Stillwater Avenue, Old Town, Maine. She had recently divorced an abusive husband who was about to be released from prison, where he was serving time for assaulting the Plaintiff and her daughter, among other offenses. The Plaintiff was in hiding from her ex-husband and had already lived in several locations to evade further physical and emotional violence.

15.     The Plaintiff was receiving psychological counseling and treatment. She was diagnosed with post-traumatic stress disorder ("PTSD") as a result of the physical, emotional, and sexual violence she suffered from her ex-husband. The Plaintiff used alcohol as a coping mechanism and, by her own admission, had a "drinking problem" at the time she met the Defendants.

**B.  The Plaintiff Meets Defendant Paulo Cerqueria and Begins Work at the Farm**

16.     On or about May 2016, the operator of a thrift store where the Plaintiff volunteered recommended the Plaintiff to Defendant Paulo as someone who might be interested in employment at the Defendants' Farm.

17.     Sometime thereafter, the Plaintiff was walking home from the thrift shop when Defendant Paulo hailed Plaintiff from the truck he was driving. He offered her $100 a week in exchange for tending his rabbits at the Farm, to begin immediately. They agreed that the Plaintiff would work five days per week, three to four hours per day. While discussing the job offer, Defendant Paulo asked the Plaintiff to tell him about herself since she would be working at his farm.  At that time, the Plaintiff told Defendant Paulo about her children and the abuse inflicted by her ex-husband.

18.     The Plaintiff gladly accepted the offer, as she had extensive past experience tending animals and was then "broke" and facing difficult financial circumstances.

19.     When the Plaintiff began the job at the Farm, she did not have access to a car or other transportation. She relied on Defendant Paulo to drive her to the Farm for work.  However, under the arrangement, Defendant Paulo would only drive the Plaintiff to the Farm at 7 a.m. and bring her home between 7 p.m. and 9 p.m. At first, the Defendants gave the Plaintiff rides home at more normal hours, but they complained it was inconvenient and kept pushing back the time they took her home. The Plaintiff would end up stuck at the farmhouse for hours upon hours until one of the Defendants decided they were ready to give her a ride home.  By September 2016, she was regularly stuck at the farm for such long hours that the landlord who rented her the Stillwater trailer thought she had abandoned the trailer because she was rarely home.

20.     Because the Plaintiff was at the Farm most days for at least 12 hours during the day, 6 days per week, her duties began to encompass other work.  She began tending all the other animals. After about 6 months, she was working at least 12-hour days at the Farm.  These hours continued until sometime in 2018.  The Defendants continued to pay no more than $100 per week.

**C.  The Plaintiff Moves to the Farm**

21.     This arrangement continued through the summer months.  In early September, the Plaintiff was evicted from her trailer. The landlord blamed her continuous absence from the trailer as justification for thinking the Plaintiff had abandoned the unit, when in reality she had been working long hours at the Farm. With poor credit, little money and the eviction on her record, the Plaintiff faced few options. The Defendants offered a welcomed solution: move in with Defendants at the Farm.

22.     The Plaintiff and her children lived with the Defendants for three weeks at the Farm, until the Defendants secured a nearby trailer. The Defendants presented the trailer as a

"rent-to-own" property that one day would belong to the Plaintiff. Initially, the Defendants explained that the Plaintiff would pay $500 per month, plus utilities (electric and propane) and property taxes, for approximately five years or "until the mortgage was paid off."  But over time the Defendants unilaterally changed the terms, telling the Plaintiff that she would need approximately seven years of payments to pay off the trailer.  Because the Defendants paid her only $100 per week, the Plaintiff had to use the public benefits she received for herself and her daughter to pay the rent.

23.     The Plaintiff also paid her own utilities. She had to pay to install two propane tanks for heat and pay for her own fuel for those tanks.

24.     The Trailer was located at 68 Towers Road, Greenbush, Maine and sat on four acres. Plaintiff obtained appliances with assistance from her mother, including a dishwasher, and clothes washer and dryer. The trailer was located about 50 yards by an adjoining back pathway from the Farm.

25.     The Farm is approximately 51 acres and is surrounded by woods.

26.     The Plaintiff was elated at the prospect of having a place of her own to live with her children, secure from her abusive ex-husband. The opportunity to own property, her reliance and trust in the Defendants, and her lack of other housing options, motivated her to proceed with the trailer deal. As part of the transaction, she signed what might be considered a standard one-year, form lease. The lease was signed by the Plaintiff and Defendant Mara.  The rent-to-own aspect of the agreement was never memorialized in writing.

27.     Of her situation at the time, the Plaintiff would later write: "The man and his wife (Defendants Paulo and Mara) were nice and were always doing nice things for us, taking us to church on Sundays and paying to take us to dinner. They told us we were family, and that was

nice…. I shared my story with my new friends (Defendants), how I had been struggling – and what with. They were supportive – between saying that they would protect us and that nobody messed with them and telling stories about what a bad ass Paulo was back in the day – how he was still a killer and we were safe."

28.     The Plaintiff did not know of anywhere within walking distance of the Farm where she could walk to for help.  For most of her time living at the Farm, the Plaintiff relied on Defendant Paulo to drive her around. She had little contact with others, save trips to Sunday church and monthly trips to town to cash her public benefits checks.

### D.  The Defendants Begin to Exploit and Abuse the Plaintiff

29.     In early October, after extensive cleaning, repairs and installation of the appliances, the Plaintiff moved into the trailer.  At this time, the Defendants began to further exploit and abuse the Plaintiff.  At first, the Plaintiff thought that she was helping this older couple that loved their animals but could not take care of them on their own.  Over time, it became clear to her that she was required to do hard physical work she did not want to do and for which she was not compensated.

30.     After a short time tending just the rabbits, the Plaintiff's chores increased dramatically. The Plaintiff's job grew from caring for the rabbits to feeding the cows, cleaning the chicken coop, caring for the other animals, and other farm work. The care of the animals became the focus of the Plaintiff's work on the Farm, including moving their feed, picking up and moving farm supplies for the animals, and helping with newly purchased animals. The animals she took care of included a herd of goats, a herd of cattle, ducks, rabbits, guinea fowl, a donkey, and a mule. On one occasion, the Plaintiff had to nurse a pig back to health when it got sick.

31.     Because the Defendants wanted to save money on cow feed, the Plaintiff had to assist the Defendants in moving buckets of leftovers from the local food bank and leftover grain from a neighboring brewery to the farm to feed the cows.  In the winter, the Plaintiff would have to chip out frozen grain to feed the cows.

32.     The various chores the Plaintiff was required to assist with, including the animals she had to care for, grew over time.  While she was working one chore, Defendant Paulo would urge her to work on the next one by saying things like "after this, can you do that" or "I can't do this today, because of my health problem, can you do it?"  If she tried to sit down, Defendant Paulo would chastise the Plaintiff.  Once she assisted with a new task, it was permanently added to her task list.  There were always more tasks to be done, and if the Plaintiff was finishing up with what she was assigned, the Defendants would find more work for her to do.  The Plaintiff was rarely given a chance to rest.  The Plaintiff's pay of $100 per week did not increase with the extra work.

33.     For example, if animals wandered off the property and made it through the ramshackle fence, the Plaintiff and her children would have to locate the missing animals and chase them back. At time the whole herd of 5-6 adult cows and their calves would escape as far as 5 miles away. This consumed much of the Plaintiff's time and that of her children.

34.     On another occasion, the house was dirty, so at some point the Defendants asked her to clean the home.  After that, cleaning the house became one of her permanent tasks.

35.     When the Defendants wanted a garden to support a "Farm Stand," the Plaintiff had to plant and tend the garden.  She personally invested more than $500 of her own money in plantings and soil preparation materials.  She also had to find ways to protect the garden so the animals would not eat all the crops, erecting a raised bed and installing pallets and fencing.

36.     The Plaintiff's children were also enlisted to help with work around the Farm. The Plaintiff's children both were required to work when they returned after school. These chores included tending to farm animals, cleaning dog pens, and cleaning Defendant Paulo's guns. The Plaintiff and her children were not paid for these tasks.  On one occasion, the Plaintiff and her son also built an addition on the Defendants' house.  The first and second summer, the Plaintiff stayed at the Farm, she and her son would string barbed wire on the fence around the property.  The third summer, her daughter had to screw pallets to the fence to keep the animals from wandering through it.

37.     On occasion, when the cows needed to be fed, the Plaintiff and her son would push out round bales of hay for the cows.  These bales would weigh anywhere between 700 and 900 pounds.  Defendant Paulo wanted the hay bales rolled up on a hill.  The Plaintiff and her son would also have to stack and put tarps on the bales of hay whenever Defendant Paulo procured new ones.

38.     On many occasions, the Plaintiff was required to slaughter and "dress" chickens and rabbits for retail sale.

39.     Any time Defendant Paulo's truck or tractor got stuck, the Plaintiff had to help dig it out.  Once Defendant Paulo's truck got in an accident that caused a bale of hay to fall from the truck. Defendant Paulo tried to insist that the Plaintiff move the bale of hay herself, even though it was getting dark.

40.     The Plaintiff relied on the Defendants for an income, was living in fear of her ex-husband, and did not want to lose her investment in the trailer; therefore, she continued working for the $100 per week she received from the Defendants.

41.     The Plaintiff was required to work late into the night.  When she finished morning and afternoon chores, she was allowed to go to her house and take her dog out to go to the bathroom.  But after that she had to hurry back to the farm to start her evening tasks.  She would not return home to her trailer often until between 9 and 11 pm.  Once or twice, she would be required to work until 3 am because of some mishap she was required to fix.  Sometimes the Plaintiff had to ask to go home, but the Defendants would belittle her for asking.  Most days the Plaintiff would have to wait until Defendant Mara felt like bringing her and her children back to house. The Defendants did not want them walking home at night.

42.     Approximately two weeks after moving into the trailer—approximately a month and a half after beginning work at the Farm—Defendant Paulo asked the Plaintiff to have sex with him. Despite the Plaintiff declining Defendant Paulo's advances repeatedly, Defendant Paulo continued to press the Plaintiff for sex. At that time, the Plaintiff was using alcohol to cope with her past traumas and chronic PTSD.  Sometime afterwards she finally relented to his advances and submitted to sex with him while she was drunk.  From that point forward, she felt she could not decline his demands for sex.  The Plaintiff would later say she feared saying "no" or resisting would upset the refuge she had found in "her safe place."

43.     After the sexual assaults commenced, Defendant Paulo would initially threaten her to not tell his wife.  He would make veiled threats, and he would also tell the Plaintiff that if Defendant Mara found out about the sexual assault, she would kill the Plaintiff.

44.     Defendant Mara would eventually back up Defendant Paulo's treatment of the Plaintiff.  She would make references to the sexual assaults, noting that if she did not know better, she would think there was "something going on" between Defendant Paulo and the Plaintiff, or state that the Plaintiff was Defendant Paulo's "second wife."

45.     The Defendants also would tell stories about Defendant Paulo's daughter from another wife.  This daughter was reportedly sexually harassed by Defendant Paulo and left when she complained and no one believed her. The Defendants refused to have any communication with this daughter unless she retracted her accusation.

**E.  The Defendants Obtained the Plaintiff's Continued Labor Through a Pattern and Practice of Physical and Psychological Abuse, Utilizing "Sweet Talk" and False Promises, Intimidation and Threats**

46.     Until early October 2019, the Plaintiff did not own a car or have access to any personal transportation. She relied on the Defendants to provide transportation. Occasionally she would ride with Defendant Paulo to provide guidance on his right side as he could not see out of that eye. There also were once monthly trips to the bank so the Plaintiff could cash her benefit checks. The Defendants also drove the Plaintiff to church services. However, the Defendants were quick to whisk her back to the Farm when the services ended, to prevent her from speaking with others. The Defendants would often pay her in cash while she was at church.

47.     The Plaintiff relied heavily on the $100 per week the Defendants paid her, as this was her sole income aside from disability payments received for her daughter and public benefits (TANF). However, if the Plaintiff ever "misbehaved," that is pushed back on anything or was perceived by Defendant Paulo as being rebellious, Defendant Paulo banished the Plaintiff back to her trailer and deducted money from her $100 weekly wages. This was especially onerous, as the Plaintiff's trailer had no food or other supplies; it meant she would have nothing to eat until allowed back on the Farm. Sometimes Defendant Paulo docked $20 per day from her pay. On the several occasions when she asked for a raise, the Defendants told her there was not enough to pay her more.

48.     The Plaintiff once raised the matter of her pay with Defendant Mara. But Defendant Mara told her that, although the Defendants wished they could pay the Plaintiff more, they did not have the money to do so because they had to pay for running the Farm.  This appeared to Plaintiff to be untrue, as Defendant Mara would sometimes return from her job at the phone company and brag about receiving more than $2,000 in take home pay.

49.     Defendant Mara would ask the Plaintiff to provide Defendants with the Plaintiff's bank account information and instructed the Plaintiff to log into her bank account using Defendant Mara's computer, ostensibly so that the Defendants could deposit the Plaintiff's wages electronically. However, the Plaintiff refused to input her bank information on Defendant Mara's computer. The Plaintiff feared the Defendants would then be able to access her bank account. Defendant Mara yelled at the Plaintiff when she refused and accused her of being disloyal, paranoid and made other disparaging insults.

50.     Around eight months after the Plaintiff began working on the Farm, she told the Defendants that the work was too much for her to do.  In response, the Defendants accused her of not loving them anymore, and that they thought that the Plaintiff was like their family.  They guilted the Plaintiff until she stopped talking about the topic.  From then on, Defendant Paulo would get angry at her if she complained about her work.  The Defendants would become angry with the Plaintiff whenever she was not compliant.  On these occasions, the Defendant Paulo would send the Plaintiff to her trailer when she complained, where she had no food, because all the groceries she purchased were stored at the Farm.

51.     The Plaintiff's trailer was not the safe haven she envisioned. Although she and her two teenage children slept there, all meals took place at the Farm. All the groceries the Plaintiff acquired with her food stamps went to the farmhouse. Once the Defendants learned that the

Plaintiff could cook, the Defendants made the Plaintiff cook their meals. For the duration of her employment by Defendants, the Plaintiff cooked almost all the meals at the farmhouse for her and the Defendants.  The Plaintiff estimated that she cooked in total "maybe three meals" in four years at her trailer.

52.     Defendant Paulo kept a key to the trailer and entered the trailer without the Plaintiff's permission. For two years he performed daily "inspections" of the trailer. On one occasion, he destroyed items in the Plaintiff's son's room. Another time, the Plaintiff woke up in her bed with Defendant Paulo standing over her. He had let himself into the trailer.

53.     The Plaintiff also became concerned about the rent-to-own agreement. Although the Plaintiff paid the annual taxes on the trailer and property, she never received a receipt for this because the Defendants handled the transactions. The Plaintiff also never received anything in writing regarding the rent-to-own aspect of the deal. When asked about this by the Plaintiff, the Defendants told the Plaintiff that they would not give her documentation until the trailer was completely paid off, questioned the Plaintiff's loyalty, guilted the Plaintiff, called the Plaintiff "crazy" and a "whack-a-doodle" for asking, and on multiple occasions each telling her to "trust me."

54.     Defendant Paulo would show the Plaintiff receipts of the payment of taxes on the trailer. However, those receipts were always in the Defendants' names.  The Plaintiff would accompany Defendant Paulo to town when she had to pay her taxes.  The Plaintiff would be forced to accompany Defendant Paulo on whatever errands he wanted to run in town.

55.     The Defendants physically and physically and verbally abused the Plaintiff and her children. On one occasion, Defendant Paulo punched the Plaintiff's son in the face, leaving the boy with a black eye.  He also shoved the Plaintiff on multiple occasions.  On one occasion,

he pushed Plaintiff's daughter off the farmhouse porch, which was a few feet high. Defendant Mara attempted to strike the Plaintiff's daughter on one occasion while the Plaintiff and her children were in the car with the Defendants. The Plaintiff had to intervene to protect her daughter. The Defendants would tell the Plaintiff of abuses they inflicted on her children when the Plaintiff was away.

56.     On two occasions, the Defendants travelled internationally, to Portugal and Canada, and brought the Plaintiff's son along with them. On one occasion, the Defendants were travelling with Defendant Mara's adult daughter. Defendant Paulo's professed reason for bringing the Plaintiff's son along was to have another man around. On another occasion, the Defendants took the son to Canada. The Defendants never asked the Plaintiff if her son could accompany them, instead they would *tell* the Plaintiff that the boy was coming along. The Plaintiff and her daughter would remain at home, working on the Farm and taking care of the farmhouse. The Plaintiff felt compelled to remain, for fear she might not be around when the Defendants returned with her son.

57.     The Defendants acquired and held onto the Plaintiff's son's passport during these trips. They maintained possession of the passport to control the Plaintiff's son. The Defendants continued to hold onto the Plaintiff's son's passport when he returned from the trips. The Defendants refused to return his passport for months, until her son eventually needed it as a form of identification when he left for boot camp.

58.     The Defendants also intimidated the Plaintiff through violent stories about their prior conduct. Defendant Paulo bragged that he had been in the military Special Forces, where he had succeeded in getting his superior officer "assassinated." He also bragged about tying up a prior employee with "zip ties" and leaving her in her own filth in a mule stall for three days. The

Defendants claimed they had done this to help the former employee detoxify.  On one occasion, Defendant Mara bragged about striking this former employee in the face.

59.    Defendant Paulo would yell at the Plaintiff and command her to do tasks, with veiled threats of "or else" if she did not do as she was told. The Plaintiff is a domestic abuse survivor with diagnosed PTSD. These behaviors recalled her past abusive relationship with her ex-husband and she felt compelled to comply with Defendant Paulo's requests.

60.    The Plaintiff's fear of violence from Defendant Paulo was bolstered by his "armory" of approximately 200 weapons. In addition, he typically carried a .25 caliber handgun in one pocket, a knife in the other pocket. He frequently would have people over to the Farm for shooting practice. Defendant Paulo sometimes would have the Plaintiff's son clean the weapons. Later, when the police confiscated Defendant Paulo's guns under the terms of the first Protection From Abuse (PFA) court order, they needed to use thirteen vehicles to confiscate the large number of weapons. On information and belief, Defendant Paulo secreted some guns away from authorities in violation of the PFA order.

61.    On one occasion, the Plaintiff slipped on ice, gashing her forehead.  The Defendants initially declined to take her for medical treatment. The Plaintiff begged to be taken to the pharmacy to get bandages, which the Plaintiff had later applied to her own head.  After that, Defendant Paulo blamed the Plaintiff for burdening the Defendants by getting hurt and forced her to work when she returned to the Farm.

62.    On another occasion, the Defendants required the Plaintiff and her son to move a snowmobile.  The Plaintiff and her son had to "deadlift" the snowmobile to move it.  The Plaintiff injured both of her shoulders while doing so.  As a result, the Plaintiff was in pain for

the following months, and still sometimes feels pain in her shoulders.  Her arm strength has not returned to what it was prior to this injury.

63.     The Defendants even exerted their influence during the Plaintiff's brief times away from work.  A few of the years she worked at the Farm, the Defendants allowed the Plaintiff to travel to visit her family for a few days for Thanksgiving.  However, when she did so, she would have to first prepare Thanksgiving dinner for the Defendants. The Plaintiff would also have to do as many of her chores in advance as possible, to minimize any farm work the Defendants might have to do while she was away.  When the Plaintiff returned, she would also have to do all the cleaning and other chores that were not completed in her absence.

### F.  The Defendants abused other employees and residents of the Farm

64.     Penobscot County Sheriff reports and the Plaintiff's accounts describe a pattern of predatory behavior. The Defendants' abuse of the Plaintiff was part of a broader pattern of abuse and exploitation of other vulnerable individuals who sought work and refuge at the Farm. These included employees and residents of the Farm, such as the former employee who was tied up in the mule stall.  The Defendants hired a number of employees for work in exchange for some combination of room, board, cigarettes, or alcohol.

65.     The Plaintiff heard stories about a former employee who was in the United States on a student visa from Russia.  That employee stayed and worked with the Defendants for some time before eventually running away.

66.     After the Plaintiff escaped, she heard that the Defendants found another woman to work for them, whom the Defendants also abused.  On information and belief, on one occasion, Defendant Paulo grabbed that other employee by the throat, shoved her into a corner, and told her to kill herself.

### G.  The Plaintiff Takes Steps Toward Independence

67.    After he turned 18, the Plaintiff's son left for military school.  At that time, the Plaintiff's son moved out from the trailer into his own apartment.  Sometime after that, Plaintiff's son went to boot camp.  The Defendants were not happy with the Plaintiff's son's departure.  After he left, Defendant Paulo tried to drive a wedge between the Plaintiff and her son, telling her that her son had abandoned her and did not love her.  Defendant Paulo also harassed the Plaintiff's son after he left, including by demanding money.  Defendant Paulo would repeatedly show up at Plaintiff's son's workplace to demand money.  The Plaintiff's son lost this job as a direct result of Defendant Paulo's harassment.  The Plaintiff's son eventually paid Defendant Paulo to end the harassment and leave him alone.  The Plaintiff's son reported Defendant Paulo's conduct to the police.

68.    With her son out of the house, the Plaintiff no longer had to worry about supporting him with her income from the Farm and it was more difficult for the Defendants to leverage their control of her children against her.

69.    Sometime in 2018, the Plaintiff had to obtain another job in order to continue to receive her state and federal benefits, and to afford the payments on her trailer.  She began working part time at a KFC/Taco Bell.  The Plaintiff appreciated the time off from farm work that came with her other job.  However, it did not occur to the Plaintiff that when she went to this other job, her children would fill her place on the Farm and would be required to do the Farm work.

70.    Sometime after that, the Plaintiff left her job at KFC/Taco Bell and began working at Lowe's. Although the Defendants did provide transportation to these jobs, they were equally insistent that the Plaintiff limit her work hours and were strict with hours they permitted

Plaintiff to work because, they said, she was needed at the Farm.  The Plaintiff was required to work on the Farm before leaving for her other jobs for the day and after returning.  If the Plaintiff spent too much time working at Lowes and the Defendants determined that she could not complete all of her tasks on the Farm, they would dock her pay and only pay her between $40 and $60 per week for her farm work.

71.     During this time, the Defendant Paulo would frequently text the Plaintiff incessantly about when she was leaving and other mundane matters. According to the Plaintiff, she was always "on call" for the Farm's work.

72.     The Plaintiff nearly lost her job at Lowe's as a result of her demanding work schedule on the Farm.  She was repeatedly late to her job at Lowe's because the Defendants would have some crises or another or require her to finish certain chores for the Farm before she left for Lowe's.  The Defendants would often get angry with the Plaintiff for leaving for work at Lowe's and would try and delay her.  On occasion, the Plaintiff would not return to the Farm from Lowe's until 11:00 p.m. but she would still be required to work on the Farm when she returned.  Any day off she had at Lowe's, she was working from morning until night at the Farm.

73.     Nevertheless, the Plaintiff's supplemental income and ability to create relationships outside the Farm allowed her to envision a life elsewhere.  The Plaintiff felt valued by her employers at Lowe's, something she had never experienced while working for the Defendants.  After she started working at Lowe's, the Plaintiff started being less submissive and stood up more to the Defendants' abuse.

74.     While the Plaintiff was at work, her daughter was either at school or at the farmhouse with Defendants.  Her daughter would take the bus to and from school.  When the Plaintiff was working at Lowe's in the evening, Defendant Paulo would let himself into her

trailer send the Plaintiff photos of her daughter over text message.  On several occasions, Defendant Paulo sent the Plaintiff pictures of her daughter sleeping in bed.  The Plaintiff interpreted these messages as threatening, was intimated by these messages, and feared for her daughter's safety.  The Plaintiff felt she needed to be at the Farm as much as possible because the Defendants would watch her daughter after school, particularly because Defendant Mara tended to get angry at the Plaintiff's daughter.

75.     The Plaintiff began standing up to the Defendants' abuse, and in return they became more hostile towards her. There would be angry arguments, yet Defendant Paulo would continue to cajole the Plaintiff later with text message love notes. The Defendant Paulo would let himself into Plaintiff's trailer and leave "love notes" under her pillow.

76.     On several occasions, the Plaintiff asked for documentation regarding the rent-to-own trailer. The Defendants refused to provide her documentation. They offered instead to draft a document saying that they loaned the Plaintiff money that she owed them. The Plaintiff refused to sign these bogus documents. The Defendants yelled and screamed at her, again accusing the Plaintiff of not trusting them.

77.     In June of 2019, the Plaintiff met a man who became her boyfriend. She attempted to hide the relationship from the Defendants. However, the Defendants eventually found out about this relationship. When they did, Defendant Paulo harassed the Plaintiff about the relationship and repeatedly asked the Plaintiff about whether she was having sex with the boyfriend. Defendant Paulo continued to repeatedly harass the Plaintiff about her boyfriend, called her a whore, and asked for more details about her sex life. On one occasion, Defendant Paulo called the Plaintiff's boyfriend at his place of employment and threatened him.

78.   Defendant Paulo tried to break up the Plaintiff's new relationship, including by attempting to guilt the Plaintiff by stating that he, Paulo, was dying and she "owed him" her affection during "the time he had left." But Defendant Paulo was not, in fact, dying.  He left her love notes under her pillow when she was working at Lowe's.  Defendant Paulo would also get angry at her for being with someone else.

79.   The Plaintiff told Defendant Paulo that she and him were never a couple and asked him to stop harassing her and her boyfriend.  Nevertheless, he continued to tell the Plaintiff that he loved her. He would corner her and grab her.

80.   The Plaintiff's relationship with her boyfriend gave the Plaintiff hope for her future. Her boyfriend helped inspire her to stand up to the Defendants' abuse.

81.   Near the end of her time working on the Farm, the Plaintiff began attending peer support classes. These classes helped the Plaintiff cope with her past trauma and understand the scope of the Defendants' abuse.

82.   In early October of 2019 the Plaintiff secured her own vehicle, a 2004 Dodge pickup truck. Her work at Lowe's became more regular, although still part time.  The Plaintiff was able to save up approximately $1,500 from her work at Lowe's to purchase the pickup.

83.   In addition to acquiring her vehicle, the Plaintiff was able to save up enough money. She secretly planned to leave work at the Farm and the trailer in the spring of 2020.

84.   After acquiring her pickup, the Plaintiff primarily used it to commute to and from her job at Lowe's.  She was also able to take a few of trips away from the Farm, including visiting her brother and her mother.

85.   The Plaintiff also took one trip with her daughter to a trampoline park on or around November 7. 2019.  The Plaintiff's daughter broke her ankle on one of the trampolines.

The next day, the Plaintiff took her daughter to the doctor, who prescribed painkillers for the Plaintiff's daughter.  When the Plaintiff returned to the Farm with the painkillers, the Defendants told her that she should give them some of the painkillers, instead of giving the painkillers to her daughter.  The Plaintiff refused.

86.     When the Plaintiff would go to work at Lowe's, she would leave one day's worth of doses for her daughter at the Farm.  Defendant Paulo became angry at the Plaintiff because she would not leave all the painkillers with them.

### H.  In Early 2020, the Plaintiff Escapes

87.     On or around January 10, 2020, the Plaintiff discovered that the Defendant was having inappropriate sexual text messages with her daughter, who is autistic. The Plaintiff later learned that Defendant Paulo waited two weeks after the Plaintiff's daughter turned 18 in November 2019 to approach her daughter for sex. The Plaintiff discovered this while she was away from the Farm with her daughter visiting her brother in Southern Maine.

88.     This discovery so angered and demoralized the Plaintiff that she decided she could no longer continue at The Farm. She sought emergency refuge on the sofa at her boyfriend's residence. She secured a room at a long-term motel the following day.  She did not return to live in the trailer. The Plaintiff went to the police station to report the conduct.  A day or two later, the Plaintiff sought and secured a Protection From Abuse Order ("PFA") against Defendant Paulo.  "I am terrified for myself and my daughter," the Plaintiff wrote in her initial PFA application. "It's been a long time since I had hope. But I'm here."

89.     On April 14, 2021, this PFA was extended by Court Order. It remains in effect through October 15, 2022.

### I.  The Defendants' Abuse Continues After the Plaintiff Flees

90.     Defendant Paulo stalked and harassed the Plaintiff after she left.  He called her while at work and went to her boyfriend's house to look for her.

91.     On one occasion, the Plaintiff heard from a mutual friend of hers and the Defendants that Defendant Paulo was tracking the Plaintiff's location on her phone.  The friend told her that Defendant Paulo had reached out to him and said he was looking for the Plaintiff.

92.     Defendant Paulo called the Plaintiff on her phone constantly.  He wrote her innumerable texts professing his love of the Plaintiff and trying to persuade her not to leave "all that she had worked for" at the Farm.  As a result, the Plaintiff had to change her phone number.

93.     Defendant Paulo also harassed the Plaintiff's son after the Plaintiff left. Defendant Paulo drove by the Plaintiff's son's apartment constantly and stalked him.  The Plaintiff's son lost his job because Defendant Paulo was calling him at work constantly.

94.      A few weeks after the PFA order was issued, the Plaintiff returned to the trailer to retrieve her possessions.  She was not able to retrieve all her possessions, including the appliances that she and her family had purchased for the trailer.  When the Plaintiff returned, it was clear that the Defendants had ransacked her trailer and taken many of the Plaintiff's possessions.  While the Plaintiff was retrieving her possessions, Defendant Mara stood nearby and stared at her; Defendant Paulo was in his car, driving back and forth nearby.  The Plaintiff felt intimidated by the Defendants' actions.

## CLAIMS

### TVPRA (18 U.S.C. §§ 1584, 1589, 1590, 1593A, 1594, 1595)

**Trafficking With Respect to Peonage, Slavery, Involuntary Servitude or Forced Labor in Violation of 18 U.S.C. § 1590**

95.     The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

96.     As alleged herein, Defendants knowingly recruited, harbored, transported, provided and/or obtained the Plaintiff for the purpose of involuntary servitude and forced labor in violation of 18 U.S.C. § 1590. The Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

97.     Defendants recruited the Plaintiff with false promises that she would be paid $100 per week and her duties would only entail taking care of rabbits for only a few hours per day, and harbored the Plaintiff at a property Defendants owned adjacent to the Farm, all for the purpose of forced labor and involuntary servitude.

98.     As a direct and proximate result of Defendants' actions, the Plaintiff has suffered severe emotional distress, physical injuries, and economic losses.

99.     The Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

**Forced Labor in Violation of 18 U.S.C. § 1589**

100.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

101.    Defendants knowingly obtained the Plaintiff's forced and coerced labor through a scheme, plan, pattern and practice of physical and psychological abuse, force, threats of force, serious harm, threats of serious harm, in violation of 18 U.S.C. § 1589.

102.    Defendants also made direct and implicit threats of serious harm against the Plaintiff's children to continue to knowingly obtain the Plaintiff's forced and coerced labor, in violation of 18 U.S.C. § 1589.

103.    The Plaintiff is permitted to bring a civil cause of action pursuant to 18 U.S.C. § 1595.

104.    Defendants subjected the Plaintiff to threats and psychological abuse designed to manipulate the Plaintiff and prevent her from seeking help from authorities or others who could have assisted her in leaving the Farm.

105.    Defendants knowingly benefited from the Plaintiff's labor and services because they did not compensate her as the law requires.

106.    As a direct and proximate result of the actions of the Defendants, the Plaintiff has suffered severe emotional distress, physical injuries, and economic losses.

107.    The Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

**Involuntary Servitude in Violation of 18 U.S.C. § 1584**

108.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein

109.    Defendants knowingly and willfully subjected the Plaintiff to a condition of involuntary servitude for a period of multiple years in the United States. Defendants forced the Plaintiff to work long hours on the Farm, doing tasks far beyond the scope of her agreed upon employment, against her will, while paying her a pittance for her services.

110.    Defendants kept the Plaintiff in a condition of involuntary servitude through physical coercion. Defendant Paulo repeatedly physically abused the Plaintiff and threatened her and her children with serious harm. He alternately used a mixture of threats, "sweet talk" and false promises to keep the Plaintiff at the Farm.

111.    The Plaintiff was highly vulnerable to Defendants' threats, and the Defendants exploited her vulnerability. Defendants were aware that the Plaintiff's ex-husband was recently released from prison, where he was serving time for physically abusing the Plaintiff and her

daughter, and that the Plaintiff was terrified that her ex-husband would seek her and her children out to retaliate for sending him to prison.

112.    Defendants, through their conduct alleged herein, created and perpetuated a system of involuntary servitude, and led the Plaintiff to reasonably believe she had no way of avoiding this servitude, in violation of 18 U.S.C. § 1584.

113.    The Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

114.    As a direct and proximate result of the actions of the Defendants, the Plaintiff has suffered severe emotional distress, physical injuries, and economic losses.

115.    The Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

**Knowingly Benefiting from a Violation of the TVPRA in Violation of 18 U.S.C. § 1593A**

116.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

117.    Defendants knowingly benefited from their participation in a venture engaging in the violations of 18 U.S.C. §§ 1584, 1589, and 1590 alleged herein. Defendants received the labor of the Plaintiff and her children.

118.    Defendants each had knowledge of the other's treatment of the Plaintiff and had knowledge of or recklessly disregarded the fact that Plaintiff's labor was obtained in violation of 18 U.S.C. §§ 1584, 1589, & 1590.

119.    The Plaintiff is permitted to bring a civil cause of action under 18 U.S.C. § 1595.

120.    As a direct and proximate result of the actions of the Defendants alleged herein, the Plaintiff has suffered severe emotional distress, physical injuries, and economic losses.

121.    The Plaintiff is therefore entitled to recover damages in an amount to be proven at trial, including attorneys' fees and other relief that the Court may deem proper.

<u>CONSPIRACY</u>

122.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

123.    At all times relevant, the Defendants were husband and wife residing at the Farm.

124.    The Defendants collectively worked to alternatively cajole and intimidate the Plaintiff to continue to work at the Farm, sharing a conspiratorial objective.

125.    The Defendants conspired to create a belief in the Plaintiff that the trailer they provided her was a "rent-to-own" property and that with payments of $500 each month, the Plaintiff would own the trailer and land free and clear in approximately seven (7) years.

126.    To this end, the Defendants also had the Plaintiff sign a document purporting to be a one-year lease. The form document lists both Defendants as owners and was signed by Defendant Mara.

127.    Defendants collectively compelled the Plaintiff to provide to the Farm all the Plaintiff's food purchased with the Plaintiff's food stamps proceeds.

128.    Both Defendants conspired in failing and otherwise refusing to provide the Plaintiff with any indicia of ownership of the trailer but continued to foster in the Plaintiff the belief that she was renting to own and the trailer and land would be hers free and clear at the end of the stated period.

129.    Both Defendants knew and otherwise fraudulently encouraged or compelled the Plaintiff to pay yearly tax assessments on the trailer and land but failed to provide the Plaintiff

with a requested receipt of these payments. All tax payments were transacted personally by the Defendants with the Plaintiff's money.

130.    Defendant Mara knew of her husband's sexual assaults on the Plaintiff, sometimes calling the Plaintiff her husband's "second wife."

131.    Despite requests by the Plaintiff, neither of the Defendants provided the Plaintiff with documents or other indicia of trailer ownership, each separately and together encouraging the Plaintiff to "trust me."

132.    Both Defendants conspired together to keep the Plaintiff working at the Farm for a subminimum wage of only $100.00, sometimes less, per week.

133.    The Defendants, thus, had a meeting of the minds, to keep the Plaintiff subservient to her hopes of one day having a secure place of her own to live with her family.

134.    As a result of the Defendants' ploy, the Plaintiff suffered damages in the amount of $500.00 per month and other money she paid towards the trailer ownership, and an amount in food stamp benefits to be determined at trial.

135.    Further, Defendant Paulo's unwelcome, nonconsensual sexual assaults, which were known to Defendant Mara, caused the Plaintiff damages in the form of severe physical and emotional distress.

136.    The actions alleged herein also amounted to a civil conspiracy to violate the TVPRA, in violation of 18 U.S.C. § 1594(b).

137.    As a direct and proximate result of the Defendants' civil conspiracy, the Plaintiff is entitled to recover damages in an amount to be determined, and all costs and fees incurred as a result.

138.    As a result of the Defendants' conspiracy, they are jointly and severally liable for all damages arising from the conspiracy.

## UNJUST ENRICHMENT/QUANTUM MERUIT

139.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

140.    The Plaintiff had an oral contract with the Defendants that she would tend the rabbits at the Farm on a part-time basis for $100.00 per week.

141.    The Plaintiff further had an oral contract providing for a "rent-to-own" the trailer and land located at 68 Towers Road, Greenbush, Maine. Under the terms of the bargain, the Plaintiff paid the Defendants $500.00 per month. She also paid the utilities (gas and electric) for the property and the annual tax assessment.

142.    The Plaintiff faithfully performed her end of the bargains for approximately four (4) years.

143.    A defendant is unjustly enriched when (1) a benefit is conferred upon her by the Plaintiff; (2) the Defendant knows of or appreciates the benefit conferred; and (3) the Defendant accepts or retains the benefit under such circumstances as to make it inequitable for the Defendant to retain the benefit without payment of its value.

144.    The Defendants had a contract or implied contract with the Plaintiff that she would work tending rabbits and live in a "rent-to-own" property.

145.    The Plaintiff duly performed her end of the bargain, and more, *inter alia*, often working in excess of 12-hour days, contributing all her food to the Farm, engaging her children to do the Defendants' work and working for far below the legally required minimum wage or wage for a person of her skills and competency for a farm- hand position.

146.    For example, in addition to merely tending (and at times slaughtering and "dressing") the rabbits, the Plaintiff was required to cook communal meals at the Farm, clean the farmhouse, constructing with her children an addition to the farmhouse, tending other barnyard animals, including feeding and cleaning pens and stalls, and generally being available at all times to care for the Farm.

147.    Plaintiff's labors, and that of her children, conferred a substantial benefit to the Defendants, for which the Plaintiff, in return, was grossly underpaid, belittled, verbally and physically assaulted.

148.    In the event no binding contractual relationship is found between the parties, the Plaintiff seeks recovery under a theory of Quantum Meruit for the reasons cited herein.

<u>ASSAULT & BATTERY</u>

149.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

150.    An actor is subject to liability to another for a battery if (1) he acts intending to cause a harmful or offensive contact with the body of the other person or a third person and (2) a harmful contact with the body of the other person directly or indirectly results.

151.    The Defendant Paulo intentionally and repeatedly without permission caused harmful and offensive sexual contact with the Plaintiff. His insistence on repeated non-consensual sex became "the norm," the Plaintiff stated in her PFA application.

152.    The Defendant Paulo frequently pushed the Plaintiff and on one occasion ripped her leather jacket when he grabbed her.

153.    As a result, the Plaintiff suffered physical and emotional damages in an amount to be proven at trial.

## FRAUD/FRAUDULENT MISREPRESENTATION

154.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

155.    The Defendants fraudulently misrepresented their intent to pay the Plaintiff the legally mandated minimum wage or even a wage commensurate with the Plaintiff's services and abilities.

156.    The Defendants misrepresented a material fact of the employment contract with the Plaintiff in that her job swiftly escalated into far more than only tending rabbits at the Farm.

157.    At the time of hire, and at other times relevant, the Defendants knew of their offer's falsity or acted in reckless disregard to of whether it was true or false.

158.    The Plaintiff reasonably relied on the misrepresentation of the Defendants to her detriment in that she would typically work 12 hours per day or more with job duties that far exceeded merely tending some rabbits.

159.    The Defendants further misrepresented to the Plaintiff that her residence was a "rent-to-own" property that she would take possession of after approximately seven (7) years paying $500.00 per month, property taxes and utilities.

160.    On numerous occasions when the Plaintiff requested documentation of this arrangement; the Defendants merely assured the Plaintiff to trust the Defendants.

161.    The Plaintiff further reasonably relied on the Defendants promises and representations that she, the Plaintiff, was residing in a "rent-to-own."

162.    The Plaintiff reasonably relied upon these assurances, paying the annual tax assessments and the utilities (electric and gas). The Plaintiff further furnished and invested in appliances for the trailer based on the Defendants' assurances.

163.     Defendants played on the vulnerability of the Plaintiff, knew of the falsity or acted in reckless disregard to whether the proposition they led her to believe was true or false. Thus, the Plaintiff believed all the while she would someday own the residence free and clear of the Defendants' interests and secure from an abusive work situation and abusive ex-husband.

164.     Each of these representations were made with a high probability of inducing the Plaintiff to remain in a exploitative and abusive work environment in the hope and expectation the Plaintiff and her children would remain to do the bidding of the Defendants.

<u>BREACH OF CONTRACT</u>

**Employment contract:**

165.     The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

166.     The Defendant Paulo offered the Plaintiff part-time work at the Farm tending rabbits 3-5 hours per day, 5 days per week for $100.00 per week.

167.     The Plaintiff accepted the offer of working part-time tending the rabbits for $100.00 per week.

168.     The terms of this agreement reached between the Defendants and the Plaintiff were reasonably certain and supported by sufficient consideration and part performance by the Plaintiff.

169.     The Defendants, individually and collectively, breached the contract by systematically increasing the amount and type of work required of the Plaintiff until she was working in excess of 70 hours per week at the Farm, performing farm work, domestic duties, even adding an addition to the Defendants' house.

170.     Rather than increase the Plaintiff's weekly pay, Defendant Paulo would oftentimes "dock" the Plaintiffs pay for alleged "misbehavior." This "docking" would sometimes amount to $20.00 per day.

171.     At all times relevant, the Plaintiff's pay rate was void as against public policy in that it was significantly below the federal and state-mandated wage of $7.25 per hour.

172.     At all times relevant, the Plaintiff performed her end of the bargain, working continuously at the Farm for approximately four (4) years.

**Contract for purchase of trailer and land:**

173.     The Defendants offered the Plaintiff a "rent to-own" contract for the acquisition of the trailer and real estate located at 68 Towers Road, Greenbush, Maine. Under the terms of the contract, the Plaintiff was to pay $500.00 per month, plus utilities, and the annual property tax assessments on the land and trailer.

174.     The terms of this agreement reached between the Defendants and the Plaintiff were reasonably certain and supported by sufficient consideration and part performance by the Plaintiff.

175.     In reliance on this promise, the Plaintiff outfitted the trailer with appliances and paid $500.00 per month, utilities (gas and electric), plus the annual real estate tax assessment for the property located at 68 Towers Road for a period of approximately four (4) years.

176.     Despite this, the Defendants failed and refused to provide the Plaintiff with any ongoing accounting of her "progress" to owning the property. When it came time to pay taxes, the Defendants took the Plaintiff's money and handled the transaction themselves, failing to provide the Plaintiff with any form of receipt. When the Plaintiff finally fled the situation, she received nothing in return for these contributions made over the years.

177.    As a result, the Plaintiff was damaged in an amount of money she paid in reliance on the rent-to-own deal, investment in appliances and other furnishings, a propane tank she purchased, and money spent on taxes.

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

178.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

179.    The Defendants intentionally or recklessly inflicted severe emotional distress, or were certain or substantially certain that such distress would result from their conduct in that:

180.    Defendant Paulo compelled the Plaintiff to engage in non-consensual sex with him on numerous occasions between the summer of 2016 and when the Plaintiff finally began to rebuff his advances in the spring of 2019. During this period, the Defendant repeatedly compelled the Plaintiff to engage in sex; in Plaintiff's words it became "the norm."

181.    The Defendants engaged in a ploy to keep the Plaintiff at the Farm with assurances that she would one day own a place of her own under a "rent to own" arrangement for Plaintiff's housing. Yet, in the end, the Plaintiff had to abandon this dream and substantial financial investment to protect herself and her children from continued abuse.

182.    The Plaintiff was repeatedly commanded to do specific chores by Defendant Paulo with the threat "or else!"

183.    The Defendants personally drove the Plaintiff to pick up Social Security benefit checks the Plaintiff received on account of her autistic daughter. The Defendants further insisted that the Plaintiff contribute all food acquired through the Plaintiff's food stamp benefits be delivered in total to the Farm for communal meals.

184.     This and other referenced conduct by the Defendants was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized society.

185.     The actions of the Defendants caused the Plaintiff severe emotional distress for which she undertook psychological counselling from February 26, 2020 to the present following her escape from the Farm. The Defendants' actions were even more deplorable as they played on the Plaintiff's existing PTSD she experiences because of trauma suffered at the hands of her abusive ex-husband.

186.     The emotional distress was suffered by the Plaintiff was so severe that no reasonable person could be expected to endure it.

<u>NEGLIGENCE</u>

187.     The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

188.     The Defendants owed the Plaintiff and her family a duty of care in that the Plaintiff resided in their dwelling and was an employee of the Defendants. Once promises were made, the Defendants had a duty to conform their actions in accordance with those promises.

189.     Based on the foregoing, the Defendants breached their duty of care to the Plaintiff and her family, by encouraging physical and emotional submission at every turn, preying on the Plaintiff's children, sexually, as was the case with the daughter, and with physical violence, as was the case with the teenage son.

190.     As a result of the Defendants' negligence, the Plaintiff suffered pecuniary and emotional harm as detailed herein.

<u>FAILURE TO MAKE TIMELY AND FULL PAYMENT OF WAGES</u>

**(26 M.R.S.A. § 621-A through 626-A)**

191.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

192.    At all times relevant to this action, the Plaintiff was an employee of the Defendants as that term is used in 26 M.R.S.A. § 621-A through 626-A.

193.    During this period, the Plaintiff was not paid commensurate with her abilities and experience, nor even the federal minimum wage of $7.25 per hour.

194.    The Defendants paid the Plaintiff at most $100 per week, yet the Plaintiff often worked 70 or more hours per week for the Defendants. Thus, the Defendants paid the Plaintiff approximately $1.43 per hour for Plaintiff's labors.

195.    By any standard, this wage was far below any reasonable amount for the work performed by the Plaintiff.

196.    As a result, the Plaintiff remains owed for past wages due and never paid pursuant to Maine's Wage Payment Laws, 26 M.R.S.A. § 621-A and § 626.

197.    Accordingly, the Defendants are liable for damages pursuant to § 626 and § 626-A. These damages include the amount of the unpaid wages, costs of suit, including a reasonable attorney's fee, and an amount equal to twice the amount of unpaid wages as liquidated damages, all in an amount to be adjudged at trial.

<u>PUNITIVE DAMAGES</u>

198.    The Plaintiff realleges each and every preceding allegation set forth in the above paragraphs as if fully set forth herein.

199.     To prove a claim warrants punitive damages, a Plaintiff must demonstrate that a Defendant acted with malice or implied malice. Malice can be implied where the defendant's deliberate conduct is sufficiently "outrageous."

200.     The Defendant Paulo specifically sought out the Plaintiff as a vulnerable individual with few prospects. He preyed upon the Plaintiff's weaknesses, which included an addiction to alcohol, and extreme fear of an abusive ex-husband who was soon to be released from prison. Following her forcible eviction from her trailer home, the Plaintiff had few options where to turn for shelter and/or employment. She moved in with the Defendants, later securing what she thought would be her first experience of home ownership. Instead, the Plaintiff endured nearly four (4) years of indentured servitude as a result of the Defendants' deliberate and calculated conduct.

<u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff requests that this Court assume jurisdiction in this proceeding, and enter judgment in favor of the Plaintiff, Jane Doe and against the Defendants and:

a)  Enter judgment for the Plaintiff as against all Defendants on all counts herein.

b)  Award actual damages, punitive damages, court costs and attorneys' fees.

c)  Award Plaintiff any and all such other relief as this Court may deem just and proper.

Respectfully Submitted,
Jane Doe
By her Attorneys,

Date: 12/21/2021

**/s/ Nicolaas Groeneveld-Meijer**

Nicolaas Groeneveld-Meijer
Pine Tree Legal Assistance, Inc
ME Bar No: 006892
PO Box 2429
39 Green Street
Augusta, ME 04338
(207) 552-3104
Nicolaasgm@ptla.org

/s/ Andrew Cherry
Andrew Cherry, Esq.
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900, Washington, DC 20001-4412
+1 202 639 6070 | TEL
ACherry@jenner.com
(Pro Hac Motion Pending)

/s/ Claire M. Lally
Claire M. Lally, Esq.
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900, Washington, DC 20001-4412
+1 202 637 6349 | TEL
CLally@jenner.com
(Pro Hac Motion Pending)

/s/ Kali N. Bracey
Kali N. Bracey
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900, Washington, DC 20001-4412
+1 202 639 6867 | TEL
KBracey@jenner.com
(Pro Hac Motion Pending)

<u>CERTIFICATE OF SERVICE</u>

By my signature, I hereby certify that a copy of the foregoing was delivered via electronic notification using the CM/ECF system and/or email of First Class mail, or duly appointed process server, as appropriate, on _____ to

Respectfully Submitted,
Jane Doe
By her Attorney,

Date: _____          **/s/**_____

Nicolaas Groeneveld-Meijer
ME Bar No: 006892
Pine Tree Legal Assistance
39 Green Street
PO Box 2429
Augusta, ME  04338
(207) 552-3104
Nicolaasgm@ptla.org